### In re WRIGHT–DANA HARDWARE CO.

(District Court, N. D. New York. September 8, 1913.)

BANKRUPTCY (§ 165*)—PREFERENCES—BANK DEPOSIT—SET-OFF.

    Prior to January 1, 1912, the bankrupt and claimant bank did business in the ordinary way; the bank receiving the bankrupt's deposits and discounting its paper with knowledge of the bankrupt's insolvency, applying deposits from time to time on the indebtedness by direction and consent of the bankrupt. On that date, however, the bankrupt's treasurer ceased actively to engage in the business, and the person in charge was told by the bank's attorney, who was also attorney for the bankrupt and vice president of the bank, that he should sell the goods of the bankrupt as fast as possible, even at cost, placing the proceeds on deposit in the bank for a space of 10 days which would be consumed in making an application for bankruptcy adjudication, which was filed January 17th. No checks were paid by the bank during this period with the exception of one for $14.35 for new goods, which it was necessary for the bankrupt to have and the drawing of which was consented to by the bank. On January 16, 1912, the bank transferred to one of the clerks in the office of its attorney two notes of the bankrupt aggregating $5,200, with interest, taking the clerk's note therefor with the notes of the bankrupt as collateral; the transferee testifying that he did not expect the bank would claim to hold him on his note for an amount larger than he could collect from the bankrupt's estate. *Held*, that the bank was entitled to the benefit of the set-off of deposits against the bankrupt's indebtedness made prior to January 1, 1912, but that the deposits applied after that date constituted a preference, and that the claims of the bank and of the transferee of the notes were not entitled to allowance except on surrender of the amount so applied.

    [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 259, 260, 266; Dec. Dig. § 165.*]

In Bankruptcy. In the matter of bankruptcy proceedings of the Wright-Dana Hardware Company, to review a referee's order disallowing a claim of the Utica City Bank unless the bank should surrender and pay over the amount of an alleged preference, and also disallowing the claim of one Robert L. Kinne unless he should surrender and pay over the amount of an alleged preference. Modified and affirmed.

See, also, 199 Fed. 632; 205 Fed. 335.

Martin & Jones, of Utica, N. Y., for trustee.
Lynch & Willis, of Utica, N. Y., for claimants.

RAY, District Judge. The petition in bankruptcy was filed against Wright-Dana Hardware Company of Utica, N. Y., on the 17th day of January, 1912, and it was adjudicated a bankrupt on the 5th day of February, 1912. The referee has found as follows:

(1) That for several years prior to the filing of such petition the said Wright-Dana Hardware Company had kept an account with the said Utica City National Bank.

(2) That September 17, 1911, the said bank was the owner and holder of certain promissory notes made by the said company aggregating over $14,000, and also the owner of other promissory notes

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

made by other parties on which the said company was liable as indorser.

(3) Thereafter the said company made payments on the said notes or renewals thereof as follows:

1911.

| | | | |
|---|---|---|---|
| Dec. 18. | Interest | $ | 30 11 |
| " 20. | Principal | | 723 55 |
| " 26. | Principal | | 376 45 |
| " 26. | Interest | | 76 |
| Oct. 7. | Principal and Interest | | 100 42 |
| 1912. | | | |
| Jan. 4. | Interest | | 48 77 |
| " 8. | Principal | | 200 00 |
| " 8. | Interest | | 1 27 |
| | Total | | $1,481 33 |

(4) For the two years prior to January 1, 1912, one Lowery, the treasurer of the company, had sole charge of its business.

(5) From that time on, having engaged in other business or duties, said Lowery ceased to be at the store of said company or *actively* engaged in the business of said company.

(6) Thereafter one Samuel Bennett, an employé, was in charge of the store of the company, and one Mabel E. Denslow, bookkeeper, had the charge of depositing its funds received in conducting the business. She had no authority to draw checks on or against the bank account of said company.

(7) For several years prior thereto Lynch & Willis, a firm of attorneys at law, had been the attorneys for said company and also the general counsel for the said bank, and these attorneys prepared and filed the petition in involuntary bankruptcy which was signed and executed by said Utica City National Bank, said Robert L. Kinne, and one George S. Dana.

(8) On said 15th day of September, 1911, said company was insolvent and unable to pay its debts and continued in that condition down to the time the said petition was filed.

(9) When Lowery ceased actively to attend to the management of the affairs of said company, January 1, 1912, no other officer of the company assumed or took charge of its affairs or business or arranged to continue same. At about that date the preparations were commenced for having said company adjudged a bankrupt.

(10) Said Bennett, however, continued in charge of the store and continued to sell the goods of the company and on or about January 1, 1912, was told by Mr. Lynch, one of the firm of Lynch & Willis, the attorneys for said company, and who was also the vice president of said Utica City National Bank, that it would be a matter of some ten days before the application for adjudication in bankruptcy would be made, and to continue to sell the goods of said Wright-Dana Hardware Company until final arrangements were made to get out, and to hurry matters along and to get in as much money as possible and sell, if necessary, at cost prices.

(11) Thereafter the selling of goods continued, the price for which the same were sold was received, and accounts due were collected and

the moneys so received and collected were deposited in said Utica City National Bank down to February 5, 1912; the last deposit having been made February 2, 1912.

(12) When Lowery, the treasurer of the company, so abandoned the business as above stated, there was an understanding arrived at or had between him and the said Utica City National Bank that no checks would be drawn upon or against the deposit of the said company in the said bank.

(13) Thereafter, and up to January 11, 1912, no check was drawn on or against such deposits, so far as the evidence shows, and thereafter only one check was drawn against it, viz., one for $14.35 January 12, 1912, payable to the order of Sargent & Co. of New York City, which was drawn with the express assent and approval of said Lynch, then one of the attorneys for the said company and also attorney for and vice president of said bank, and was drawn to obtain certain goods from the said Sargent & Co. and which could not otherwise be obtained.

(14) At the close of business January 10, 1912, the amount on deposit in said bank to the credit of said company was $52.69. Thereafter, the same year, the following sums were deposited pursuant to such understanding and from such sales and collections, viz., January 11th, $109.55; January 13th, $300.73; January 15th, $166.-07; January 16th, $100; January 18th, $271.42 and $100; January 19th, $123.14; January 22d, $174.81; January 24th, $78.94; January 27th, $220.29 and $95.75; January 30th, $121.36; and February 2d, $132.33.

(15) The total of such deposits during said times, less said check, was $2,032.73.

(16) January 16, 1912, the day before the petition was filed, the said bank applied $639.04 of such deposit then standing to the credit of said Wright-Dana Hardware Company to the partial payment and satisfaction of one of the said notes still held and owned by the bank and made by the said company, and on the 26th day of January, 1912, the said bank applied and credited $75 of such deposit standing to the credit of said company in such bank to the payment of a note, made by Doti and Pandolfi and indorsed by said company, and which note was owned by the bank. These applications of this deposit on these notes was not authorized by the Wright-Dana Company.

(17) February 5, 1912, the day the adjudication in bankruptcy was made, the deposit to the credit of said bankrupt in said bank, not deducting or allowing such sums, $629.04 and $75, was $2,032.73.

(18) That the said City National Bank had cause to believe that the said payments aggregating $1,481.33, made between December 18, 1911, and January 8, 1912, on said notes and renewals thereof, mentioned in finding 3 would effect a preference in its favor out of the assets of said company.

(19) That said bank had reasonable cause to believe the receipt and retention of the said sums mentioned in finding 14, and aggregating, less the check, $2,032.73, would effect a preference in its favor from the assets of said company.

(20) That the claim of said Robert L. Kinne is based on certain of said promissory notes which were transferred by said City National Bank to the said Kinne formally merely and only for the purpose of permitting or enabling Kinne to enforce the claim thereon for the bank, and in effect that said bank was and is the real owner of said notes so transferred.

The referee finds as a conclusion of law that such claims should not be allowed until the bank has surrendered and paid over to the trustee in bankruptcy said sum of $1,481.33 and the amount of such deposits, less the check paid, or $2,032.73.

### Note of $1,300.

As to the payments mentioned in finding 3, the facts are as follows: June 7, 1911, the Wright-Dana Hardware Company gave the Utica City National Bank its note for $1,300, due December 18, 1911, and on that day, by direction of Lowery, the treasurer of the company, the bank credited on the note $30.11 and charged the account of the company that sum and took a renewal note of $1,300, due in two days or December 20, 1911. On December 20, 1911, the company held the note of one Fenton W. Johnson for $700, which the company turned over to the bank, which discounted same and credited the account with the proceeds and by direction of Lowery charged the account $723.55 to apply on such note of $1,300, thereby reducing it to $576.45, for which sum a new note was given, due December 26, 1911. December 26, 1911, when this note fell due, Lowery instructed the bank to charge the account $377.12 to apply on the note, which was done, and a new demand note of $200 was given. This left the note of $200, dated December 26, 1911, outstanding and it forms part of the claim.

### Note of $100.

October 7, 1911, the bank held a note of the company, dated September 7, 1911, which fell due that day, and Lowery instructed the bank to charge the account of the company $100.42 in payment thereof, which was done.

### Note of $1,900.

January 4, 1912, the bank held the note of said company for $1,900, on which $48.77 interest was due, and the account of the company was charged that sum and a new note of $1,900 given due January 6, 1912. January 8, 1912, this note was reduced $201.27 by charging the account of the company that sum with the assent of the company, which gave a new note of $1,700, and it, less credits, forms part of the claim.

The claims presented by the Utica City National Bank are: Note $3,300, dated May 3, 1911, on demand with interest from August 1, 1911. Note $2,300, dated August 9, 1911, on demand, interest from date. Note $200, dated December 26, 1911 (before mentioned), on demand, interest from date. Note $1,700, dated January 8, 1912 (before mentioned), and interest on which is credited $629.04, January 16, 1912. This credit on this note was made by the bank the

day before the petition in bankruptcy was filed by charging the account of the company $629.04 and crediting same on the note. December 26, 1911, Michele Pandolfi and Rocco Dole gave said company its note of $75, due January 26, 1912, and same was discounted by the bank for the company which indorsed it. January 26, 1912, when said note became due, the bank charged the account of the company the amount of such note. No authority was given the bank to charge the account either this sum of $629.04 or $75. The bank also files a claim of $220.29 on a note made by said Doti and Pandolfi and indorsed by said company and which fell due March 26, 1912.

Robert L. Kinne files his claim on two notes made by said Wright-Dana Hardware Company and indorsed by it, viz., one dated June 27, 1911, for $2,400, and interest from August 1, 1911, and the other for $2,800, dated May 23, 1911, and interest from August 1, 1911.

As to the relations of the Utica City National Bank and the Wright-Dana Hardware Company and the individual members of the respective corporations, the facts seem to be as follows: Arthur J. Lowery was one of the incorporators of the Wright-Dana Hardware Company, a director and its treasurer. When the company was organized, Charles Symonds and De Puyster Lynch were stockholders, but Mr. Symonds ceased to be a stockholder in 1904. He is the president of the Utica City National Bank, and Mr. Lynch has been its vice president since 1910. The Wright-Dana Hardware Company made its deposits with said bank and no other. Mr. Lynch has been assisting in the management of the bank and was also the attorney of the Wright-Dana Hardware Company, being one of the firm of Lynch & Willis, which firm was general counsel for the said bank. Mr. Kinne seems to have been in the office of Lynch & Willis.

The evidence is sufficent to show that, from September, 1911, on, the bank was familiar with the involved financial affairs and condition of the Wright-Dana Company. August 31, 1911, the indebtedness of the company was $32,561.79. In 1909 its loss was $9,123.92; in 1910 its loss was $7,466.97; and in 1911 its loss was $5,481.79—in all about $22,000. The main portion of the indebtedness of the company to the bank had existed for several years. The cause of change from time to demand notes was that Mr. Symonds, president of the bank, wanted the line of credits reduced, and from time to time Lowery had conferences with Mr. Symonds as to the indebtedness of the company, and in a general way Lowery told him that the company needed some money; that they were trying to interest additional capital and did not want the bank to crowd them. Lowery says, and Mr. Lynch does not contradict, as follows:

"Q. Had you, after summer and spring of 1911, conferences from time to time with Mr. Lynch in respect to your financial affairs? A. Yes. Q. Gone over those matters with him? A. Yes."

I think it is presumed, or at least fairly may be assumed or inferred from this uncontradicted evidence, that Lowery told Mr. Lynch the truth and disclosed the situation. As to the assets of the Wright-

Dana Company, Lowery says, and the evidence is not disputed, that the same consisted of fixtures, accounts receivable, and stock. The stock was diminished from September 11, 1911, to February 5, 1012, but it varied only as the ordinary sales would vary it, and the sales were not large. The fixtures did not vary much, and the accounts receivable did not vary more than about $1,000. At the time of the Bankruptcy the accounts receivable were $2,621.74 good and $2,-178.83 bad. Of these accounts the trustee has collected $2,212.17, and the value of the uncollected accounts is about $150. The stock and fixtures of the company at the time of the bankruptcy sold for $8,750. As the indebtedness of the company September 1, 1911, was over $32,000, and there is no evidence of any substantial decrease, if we assume that the company, Mr. Lynch, and Mr. Symonds considered the bills receivable to be worth $5,000 and that the stock and fixtures were worth about $10,000, making allowance for decrease by sales, it seems certain they knew from September on that the Wright-Dana Company was hopelessly insolvent. There is no evidence that bankruptcy was contemplated prior to January 1, 1913, unless we are at liberty to infer that it was in mind prior to that date.

When Lowery left the store January 1, 1912, he left Bennett in charge and told him to keep the store open and go along as before. Mr. Lynch told Bennett to "hurry matters along and get in as much money as possible and sell even if I (Bennett) had to sell at what articles cost." After Lowery left, Bennett went to Mr. Lynch and had an interview with him. Lynch told him to stay and continue until something further developed. Bennett also says:

"I asked whether or not it would be a good plan to sell every one that came in the store at what an article cost, and he said to get price (cost?) of article rather than let the party go. Q. To make a sale if possible? A. Yes. * * * I wanted to know just what to do, and he (Lynch) told me it was a matter of ten days until they applied to the courts for bankruptcy and told me to continue to sell goods until final arrangements were made to get out. * * * Q. Did you have any talk with anybody in the office of Lynch & Willis? A. Yes, Mr. Kinne. Q. What conversation with Mr. Kinne? A. Along the same lines; he was of the same opinion. * * * Q. Was there anything said by Mr. Lynch or Mr. Kinne as to deposits being made frequently? A. There was something said; if there was no deposit made for two or three days some one from the bank would send word down as to why deposits were not made."

He also testified that creditors wanted their pay but Miss Denslow told him not to pay.

Robert Kinne says he was in the employ of Lynch & Willis and personally had charge of getting up the petition in bankruptcy. This was executed by the Utica City National Bank, said Kinne, and Geo. S. Dana. As to the notes transferred to him, Kinne says that he is an attorney at law with the firm of Lynch & Willis, and that he acquired the notes on which he bases his claim from the Utica City National Bank. He says:

"The transaction took place January 16 (1912), and the bank transferred to me two notes aggregating $5,200, with interest that was unpaid, and I gave my promissory note to the Utica City National Bank for that amount; also placed those two notes with the Utica City National Bank as collateral securi-

ty for my note and they retained the notes. Q. As matter of fact the bank would only claim under the note it holds against you the amount that may be collected on these two notes? A. I assume that to be the case; I never thought they (the bank) would try to collect the $5,200."

The evidence also shows that it was understood that no checks should be drawn against the deposits, and that it was the purpose of the bank and these irresponsible persons left in charge of the place of business of the Wright-Dana Hardware Company, with the acquiescence of Lowery, the treasurer, to convert the assets of the company so far as possible into money and deposit it in the Utica City National Bank to the end that the bank should apply it on the notes held by it and claim to offset under the authority of New York County National Bank v. Massey, 192 U. S. 138, 24 Sup. Ct. 199, 48 L. Ed. 380. In effect the bank took and had control of the company and the possession of its property from and after January 1, 1912, and in effect those assets were being disposed of and the proceeds of sales and collections turned over to or taken possession of by the bank. It was giving directions, and its directions were being obeyed. The assets were being disposed of and collection of accounts were being made and importunate creditors turned away empty-handed with the knowledge and pursuant to the instructions of the vice president of the bank, who was also attorney for the company or one of its attorneys. New York County National Bank v. Massey, supra, sanctions no such transaction. The syllabus of the case is as follows:

"The balance of a regular bank account at the time of filing the petition is a debt due to the bankrupt from the bank, and, in the absence of fraud or collusion between the bank and the bankrupt with the view of creating a preferential transfer, the bank need not surrender such balance but may set it off against notes of the bankrupt held by it and prove its claim for the amount remaining due on the notes. Pirie v. Chicago Title & Trust Co., 182 U. S. 438 [21 Sup. Ct. 906, 45 L. Ed. 1171], distinguished."

Here is a clear case of collusion between the bank and the bankrupt with the view of creating a preferential transfer, and the transactions above recited and not denied would operate as an actual fraud on the other creditors if allowed to stand and treated as a mere offset. When Lowery left the place of business of the company as he did and left it in the hands he did, and the vice president of the bank, the legal adviser of the company, gave the instructions he did, which were obeyed, and payment to other creditors was refused, it is evident that the purpose was to prefer the bank on the one hand and receive a preference from an insolvent debtor on the other and to place the money deposited in such situation that it could not be used by the Wright-Dana Company in its business; that is, withdrawn by check. This substantial abandonment of the property of the Wright-Dana Hardware Company by the treasurer and this taking possession, in effect, by the bank which, in effect, directed its disposition, together with the directions and conduct as to the disposition of such proceeds of sales and collections, was an appropriation thereof by the bank to the payment of its debt, and the sales and deposits were procured and secured for this very purpose and not for the purpose of having an ordinary deposit made subject to check, one where the

ordinary relation of debtor and creditor between this bank and company would and did exist. These transactions subsequent to January 1, 1912, contemplated the sale and disposition of the stock of goods and collection of outstanding accounts for the benefit of the bank alone and to make payment on the notes held by it, and consequently the moment the sale or collection and deposit were made the estate of the bankrupt was diminished by so much for the benefit of the bank. When the sales were made and the money deposited, the Wright-Dana Hardware Company no longer had any control over the property or its proceeds or the collections made. It was intended that it should not.

In the Massey Case, supra, the court said (192 U. S. 146, 147, 24 Sup. Ct. 201, 48 L. Ed. 380):

"This section 1 (25), read with sections 60a and 57g, requires the surrender of preferences *having the effect* of transfers of property 'as payment, pledge, mortgage, gift or security' which operate to diminish the estate of the bankrupt and prefer one creditor over another.' The law requires the surrender of such preferences given to the creditor within the time limited in the act before he can prove his claim. These transfers of *property,* amounting to preferences, contemplate *the parting with the bankrupt's property for the benefit of the creditor* and the consequent diminution of the bankrupt's estate. *It is such transactions, operating to defeat the purposes of the act,* which under its terms are preferences. * * * There is nothing in the findings to show fraud or collusion between the bankrupt and the bank with a view to create a preferential transfer of the bankrupt's property to the bank, and in the absence of such showing we cannot regard the deposit as having other effect than to create a debt to the bankrupt and not a diminution of his estate."

In the case now before this court there was a parting with the bankrupt's property, first a sale and collection of accounts and then a deposit for the benefit of the bank and for the very purpose of having the deposits held by the bank and applied on the notes held by it. The evidence here does show "collusion with a view to create a preferential transfer of the bankrupt's property to the bank," and no other conclusion is possible. But as to the deposits prior to January 1, 1912, and the application of the deposits on the notes held by the bank, we have a different situation and a different state of facts. As to those transactions it is a question whether these constitute preferential payments or mere offsets. Prior to January 1, 1912, the business of the company was being conducted in the usual manner. Sales were made, the money collected and placed in the bank in the usual course. It is true that the bank insisted on having demand or short-time notes. Of course there could be no offset until the notes became due, and it is evident that Mr. Symonds, the president of the bank, desired to have matters in such shape that the amount in bank to the credit of the company could be applied on its indebtedness to the bank at short intervals. But if the deposits were made, in the absence of collusion or fraud, and the relation of debtor and creditor between the bank and the company as to such deposits prior to January 1, 1912, was created and existed, could not the parties offset the one indebtedness against the other in whole or in part, the company directing the bank to charge its account so much and apply it

on one of the notes? In short, when these applications, prior to January 1, 1912, were made, the bank owed the company certain sums by reason of the deposits then or before made, and the company owed the bank certain notes then due. Here was a mutual indebtedness and by mutual understanding the deposit, to an extent, was offset or applied as a payment in whole or in part on the note, one or more of them. There is no evidence, unless by inference, that bankruptcy was then contemplated or that any preference was intended by the company. As stated, the bank must have known that the company was in fact insolvent, but business was being continued in the usual manner down to January 1, 1912. If bankruptcy (that is, the filing of a petition) had occurred on either of the days when the application of deposits on notes was made prior to January 1, 1912, the deposit would have been offset on the notes. New York County Bank v. Massey, 192 U. S. 138, 147, 24 Sup. Ct. 199, 201 (48 L. Ed. 380), where the court said:

"As we have seen, a deposit of money to one's credit in a bank does not operate to diminish the estate of the depositor, for when he parts with the money he creates at the same time, on the part of the bank, an obligation to pay the amount of the deposit as soon as the depositor may see fit to draw a check against it. It is not a transfer of property as a payment, pledge, mortgage, gift, or security. It is true that it creates a debt, which, if the creditor may set it off under section 68, amounts to permitting a creditor of that class to obtain more from the bankrupt's estate than creditors who are not in the same situation and do not hold any debts of the bankrupt subject to set-off. But this does not, in our opinion, operate to enlarge the scope of the statute defining preferences so as to prevent set-off in cases coming within the terms of section 68a. If this argument were to prevail, it would in cases of insolvency defeat the right of set-off recognized and enforced in the law, as every creditor of the bankrupt holding a claim against the estate subject to reduction to the full amount of a debt due the bankrupt receives a preference in the fact that to the extent of the set-off he is paid in full."

It seems to me that what the law would do and sanction in case a petition was filed it would permit the parties to do prior to that time, in the absence of any collusion or intent and purpose on the part of the one to give a preference and on the part of the other to receive a preference.

We come to this proposition, viz.. if a bank, receiving deposits in regular course from a mercantile firm, knows that such firm is in fact insolvent but continues to receive its deposits and discount its paper, applying deposits from time to time on such notes by direction and consent of the firm, does it do so at its peril of being compelled to refund all such sums so applied within four months of the filing of a petition in bankruptcy, in case one is subsequently filed, if it would prove the balance of its claim against the bankrupt estate, the deposit having been received subject to check and not with a view to use it as a set-off or payment on the note or notes? If this is the law, then banks must cease to do business with men, firms, and corporations engaged in business the moment they are advised of insolvency. In the Massey Case, on the 23d day of January, the bankrupt asked the bank to extend two notes coming due January 26th stating they would be unable to pay the notes when due. In the afternoon

they delivered a statement as of January 22d, showing assets $19,-095.67 and liabilities $65,864.61. January 25th the bankrupts made a deposit of $1,803.95, bringing their total deposit up to $6,209.25. Later the bank honored a check drawn on the account. January 26th a note held by the bank fell due. January 27th a petition in bankruptcy was filed, and on the 27th adjudication was had. The bank in its proofs of claim credited the balance of the deposits on its notes or the note which fell due January 26th. It was held that the bank had the right to do this. It is noticed that $1,803.95 was deposited after the bank actually *knew* of the insolvency. The check paid thereafter was only $16. It seems to me that this decision of the Supreme Court of the United States (New York County Bank v. Massey, 192 U. S. 138, 147, 24 Sup. Ct. 199, 48 L. Ed. 380) is decisive of this case as to the amount of the deposits applied on the notes held by the bank prior to January 1, 1912, or $1,231.29, and equally decisive as to the applications thereafter, viz., $48.77, $200, $1.27, $629.-04, $75, and $1,328.69; the last sum ($1,328.69) being the balance on deposit after deducting the $624.04 and $75 applied January 16, 1912, and January 26, 1912. See, also, Studley v. Boylston Nat. Bank, 229 U. S. 523, 33 Sup. Ct. 806, 57 L. Ed. 1313.

My conclusions are that the order of the referee should be modified so as to provide that the claim of the bank and that of Kinne, in fact a claim of the bank, shall not be allowed unless the bank pays over to the trustee in bankruptcy said sums, aggregating $2,282.77, being the amount of the preference paid and retained by the bank or appropriated by it, viz., $48.77 applied January 4, 1912; $201.27 applied January 8, 1912; $629.04 applied January 16, 1912; $75 applied January 26, 1912; and the balance of the account applied and retained at the time or day before the petition was filed, $1,328.69. In case such sums are paid over, the bank will be entitled to file a new claim for the amounts applied and disallowed or an amended claim so as to include the amount of such notes without deducting the amounts held to be preferences, and this notwithstanding the year for filing claims has expired.

So ordered.